

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-15-00037-CR

THE STATE OF TEXAS, Appellant

V.

ERICA LYNN FULLER, Appellee

On Appeal from the 6th District Court
Lamar County, Texas
Trial Court No. 25545

Before Morriss, C.J., Moseley and Burgess, JJ.
Opinion by Justice Burgess

# OPINION

Erica Lynn Fuller was convicted by a jury of theft of property having a value of $1,500.00 or more but less than $20,000.00 from Thomas Hughes. *See* Act of May 29, 2011, 82d Leg., R.S., ch. 1234, § 21, sec. 31.03(e)(4)(A), 2011 Tex. Gen. Laws 3302, 3310–11 (amended 2015) (current version at TEX. PENAL CODE ANN. § 31.03(e)(4)(A)) (West Supp. 2015)). On Fuller's motion, the trial court entered a judgment notwithstanding the verdict, finding Fuller not guilty of the charged offense.[1] The State appeals the trial court's judgment. *See* TEX. CODE CRIM. PROC. ANN. art 44.01(a)(3) (West Supp. 2014); *State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996). Because the evidence is legally sufficient to support the jury's verdict, we reverse the judgment of the trial court and remand for further proceedings.

---

[1]After the entry of the judgment notwithstanding the verdict, the State filed a petition for writ of mandamus asking this Court for relief from the trial court's judgment. In denying the State's petition, we recognized that "the Texas Court of Criminal Appeals has held that a trial court in a criminal case does not have the authority to grant a judgment such as a judgment notwithstanding the verdict, other than that rendered by the jury, and the entry of such an order is improper." *In re The State of Texas*, No. 06-15-00018-CR, 2015 WL 545838, at *1 (Tex. App.—Texarkana Feb. 11, 2015, orig. proceeding) (mem. op., not designated for publication) (citing *State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996)); *see also* TEX. CODE CRIM. PROC. ANN. art. 42.01, § 1(7) (West Supp. 2014).

> Nevertheless, trial courts do maintain the authority to order new trials for evidentiary sufficiency in criminal cases; a power which is the functional equivalent of granting a JNOV in a civil case. Therefore, when a jury returns a guilty verdict and the trial court grants the defendant's motion for new trial based upon insufficiency of the evidence under Texas Rule of Appellate Procedure 30(b)(9), double jeopardy prevents the trial court from entering any other judgment than an acquittal. . . . Therefore, a trial court's JNOV ruling after a jury determination of criminal guilt accomplishes exactly the same effect as granting the defendant a new trial for insufficient evidence—a functional acquittal.

*Savage v. State*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996) (citations omitted). We thus determined that "although the trial court mislabeled its order, it was within its authority to enter the judgment of acquittal." *In re State*, 2015 WL 545838, at *1. Accordingly, the State had an adequate appellate remedy. "Since the trial court's order is a post-judgment ruling, appellate review of its legal sufficiency evaluation is constitutionally permissible." *Id.* at *2 (citing *Savage*, 933 S.W.2d at 500). Further, the time for a direct appeal by the State had not expired when we issued that opinion. *Id.*; *see* TEX. CODE CRIM. PROC. ANN. art. 44.01(d) (West Supp. 2014).

## I.    Factual Background

### A.    Introduction

Brentwood Terrace (Brentwood) is a nursing and rehabilitation center in Paris, Texas. Fuller was Brentwood's bookkeeper.  As part of its operation, Brentwood maintained two bank accounts, a trust account and an operating account.  The two accounts were maintained and accounted for separately by separate employees.  Brentwood maintained and accounted for the trust account on behalf of its residents, and it maintained and accounted for the operating account on its own behalf.

Fuller was responsible for making deposits into both accounts.  Brentwood required funds intended for payment of residents' room and board expenses to be deposited into the trust account and then transferred to the operating account instead of being deposited directly into the operating account.  When problems were discovered with missing deposits, Brentwood fired Fuller, and the State charged her with theft. The missing deposits and subsequent transfers from the trust account to the operating account form the basis of the State's case against Fuller.

### B.    The Parties' Positions

The State's theory of liability was simple:  Fuller stole cash intended for deposit into the trust account for transfer to the operating account, and she covered up that theft by transferring resident Hughes' money from the trust account to the operating account.[2]  Thus, Fuller stole from Hughes as alleged in the indictment.  Fuller's defense was also simple:  Because Fuller only

---

[2]According to Brentwood's normal operating procedure, cash was deposited into the *trust account*, but no cash was actually deposited into the *operating account*.  Instead, cash intended for direct deposit into the operating account was converted to a money order and then deposited.

transferred Hughes' money to the operating account, where she had no ability to access it, and because Brentwood transferred Hughes' money back to the trust account, the State failed to prove that Fuller appropriated Hughes' money with the intent to deprive him of those funds. Thus, the State failed to prove that Fuller stole from Hughes as alleged in the indictment. The facts are a bit more complicated. To understand the State's and Fuller's theories, a more detailed explanation of Brentwood's bookkeeping procedures is necessary.

### C. Brentwood's Bookkeeping Procedures

As noted previously, Brentwood utilized two bank accounts. The trust account was maintained at a local bank in Paris, Texas.[3] The operating account was Brentwood's actual business account and was maintained in an out-of-state bank. The procedure for depositing money into the two accounts differed significantly.

The majority of deposits into the trust account were made to provide residents funds to spend on personal items such as refreshments, haircuts, and miscellaneous items. Yet, the residents and their family members did not deposit funds directly into the trust account. Instead, all trust account deposits were delivered to Brentwood receptionist Angie Whipkey. Whipkey would provide the depositor with a receipt indicating the date received and whether the funds were received by cash or check. Whipkey would then place checks and cash she received into a deposit bag she kept under her desk. She would deliver the deposit bag to Fuller during her lunch hour to

---

[3]While there is only one trust account, Brentwood maintains an individual accounting of each resident's deposits and withdrawals from the account. Thus, each resident has a separate trust account for accounting purposes, but all of the funds are commingled in a single bank account.

4

be placed in a locked filing cabinet located behind Fuller's desk. At the end of the day, Fuller was responsible for depositing trust account monies into Brentwood's locally maintained trust account.

The majority of deposits by or on behalf of residents into the operating account were to cover room and board expenses. Fuller deposited these items into the operating account for payment of room and board expenses in different ways, depending upon the form of payments. Some residents' room and board payments were directly deposited into the Brentwood operating account by agencies of either the State or federal government. Other residents (or their family members) would deliver cash or check payments to Whipkey in person to cover these expenses. Whipkey would then give them a receipt and place the funds into the deposit bag that she gave to Fuller, just as she did with money intended for deposit into the trust account.

When room and board payments were made in person, Fuller deposited the funds into the operating account in one of two ways. In some instances, Fuller deposited the funds into the operating account electronically. To accomplish the electronic deposits, Fuller converted the cash into money orders, scanned the checks and money orders, and then electronically deposited the scanned images into the operating account. In other instances, Fuller deposited the cash or checks into the trust account and then transferred that money from the trust account to the operating account in payment of the residents' room and board.[4]

---

[4]Because room and board fees are technically "accounts receivable" due Brentwood, these funds were deposited into the trust account, but were destined for transfer to the operating account. No explanation was given to show why these operating funds were not directly deposited into the operating account where they were ultimately intended to go, but this alternative method of deposit and transfer was apparently standard practice at Brentwood.

The procedure for transferring funds for room and board from the trust account to the operating account involved several steps. First, Fuller deposited funds into the trust account as described above. She then prepared a trust account check disbursement form reflecting trust account deposits made on behalf of each resident, with a total of all such payments listed at the bottom of the sheet. Then, she issued one trust account check, for the total of all trust account deposits for room and board fees (or other accounts receivable) to Brentwood. After having been signed by the proper party,[5] the check was scanned by Fuller for electronic deposit into the operating account. Fuller then delivered the trust account disbursement form to Glenda Neisler, Brentwood's business office manager, who would credit each payment to the proper account.

The Brentwood accounting system contained two sets of records. One set of records was kept for the trust account and another was kept for the operating account. The two sets of records were kept on the same computer system, but were accessed by separate log-in identifications and passwords. Fuller was in charge of maintaining the trust account records, and Neisler was responsible for maintaining the operating account records. Brentwood kept responsibility for each account separate so that there would be no overlap. Thus, although Fuller could make deposits into both accounts, she could not transfer funds from the trust account to the operating account by herself because she could not sign the trust account check that was deposited into the operating account. Moreover, once the funds were transferred to the operating account, Fuller no longer had access to them.

---

[5]Fuller did not have authority to sign checks.

6

**D**.       **The December 2010 Audit and Subsequent Investigation**

During a December 2010 audit, the Texas Department of Aging and Disability Services (the Department) discovered that the petty cash fund was short.[6] Because Fuller and Whipkey had exclusive access to the petty cash box, they were suspended from employment pursuant to company policy. Carolyn Miller, the Medicaid billing manager for Diversicare Healthcare, Brentwood's parent company, investigated the petty cash fund further. Miller's investigation revealed that cash intended for deposit into the trust account for transfer to the operating account had not been deposited by Fuller. According to Miller, Fuller covered for the missing cash by transferring funds from resident Hughes' trust fund account into the operating account.

**1. Thomas Hughes' Trust Account**

As part of her investigation, Miller audited Hughes' account. Hughes' bill for room and board—which averaged $3,500.00 per month—was paid in full each month by Medicaid. These funds were electronically deposited directly into the operating account by the state comptroller. Consequently, no transfers from the trust account to the operating account were necessary to pay Hughes' room and board. In June 2010, Hughes received a lump-sum, retroactive payment for social security disability benefits in the amount of $8,346.82. Because Hughes' room and board fee was paid monthly by Medicaid, this disability check was appropriately deposited into the trust account for Hughes' personal use.

---

[6]In addition to the trust and operating accounts, Brentwood also maintained a petty cash fund at the facility. The petty cash fund contained a small amount of cash from the trust account that Brentwood kept on premises so that residents could access small amounts from their trust funds without going through the formal process of issuing a trust fund check. Although the transactions resulting in the present criminal charge did not involve the petty cash fund, the 2010 audit of that fund and subsequent investigation led to the discovery of the missing operating account deposits and transfers from Hughes' trust account.

### 2. Cash Payments for Two Residents' Room and Board Were Received, But Not Deposited

In July 2010, two cash payments were received on behalf of two other residents for room and board. Whipkey issued a receipt dated July 6, 2010, reflecting a $2,031.00 cash payment from resident Boswell for rent. Whipkey issued a second receipt dated July 9, 2010, reflecting a $1,416.84 cash payment from resident D. Lawler for rent. Because each of these payments were for room and board, they were ultimately intended for deposit into the operating account.

Yet, Miller discovered that the Lawler payment of $1,416.18 and the Boswell payment of $2,031.00 were not listed on any of the trust account deposit slips completed by Fuller for the month of July 2010. Based on Miller's audit, there was no indication that the Lawler and Boswell payments were ever deposited, either by cash or by check, into the Brentwood trust account at the local bank. Likewise, there is no record reflecting that either of these payments was converted into a money order for direct electronic deposit into the operating account, and the operating account does not reflect any deposits of the Boswell and Lawler payments. Consequently, while the records established receipt of the Boswell and Lawler payments, no record shows that those funds were deposited in either the trust account or the operating account.

### 3. The Disbursement Log Reflects Payments of Boswell's and Lawler's Room and Board Fees Equal to the Cash Deposits

Despite the absence of any records showing that the Lawler and Boswell funds were deposited into the operating account, the trust account check disbursement log created by Fuller, dated July 16, 2010, nevertheless reflects a payment by Boswell in the amount of $2,031.00 and a payment by Lawler in the amount of $1,416.84. The disbursement log also reflects various payments made on behalf of other residents. The total of all such payments, as reflected on the disbursement log, was $23,278.81. Fuller wrote a check dated July 16, 2010, in this amount to Brentwood for deposit into the operating account.

Thus, while there was no record of any deposit of funds into the trust account reflecting the Lawler and Boswell payments, the disbursement log's total of $23,278.81 included these amounts. Consequently, Lawler and Boswell were credited for their July room and board payments, even though the funds delivered to make these payments were never deposited into the trust account. Miller testified that when a trust account check includes money that was never deposited, there is a loss of funds in the trust account.

### 4. Hughes' Trust Account Reflected a Transfer to the Operations Account in an Amount Equal to the Missing Boswell and Lawler Cash Deposits

The trust account transactions list, created by Fuller, also reflects a room and board payment by Hughes on July 16, 2010, in the amount of $3,447.84. The July 16, 2010, Hughes payment and the corresponding deduction from Hughes' trust account are suspect because (1) Hughes did not owe a room and board payment at that time, (2) Hughes had a large amount of discretionary funds in his trust account, and (3) the total amount debited from Hughes' account—

9

$3,447.84—equals the sum of the Lawler payment of $1,416.84 and the Boswell payment of $2,031.00. Miller testified that she believes Fuller accounted for the missing trust account deposits by transferring an equal amount of funds from Hughes' trust account to the operating account for fees he did not owe.

### 5. A Similar Transfer Was Made in an Amount Equal to a Missing Cash Deposit for Resident Ballard

Miller also identified a cash deposit made on behalf of resident Ballard in the amount of $137.50. The receipt drawn by Whipkey is dated December 6, 2010. The quality of the receipt is poor, and there was no testimony regarding the intended use of that money. Yet, the December 27, 2010, trust account check disbursement log created by Fuller reflects a payment by Ballard in the amount of $137.50. The disbursement log likewise reflects various payments made on behalf of other residents. The total of all such payments, as reflected on the disbursement log, was $4,155.35. Fuller wrote a check in that amount to Brentwood, dated December 27, 2010, for deposit into the operating account. Accordingly, although there was no record of any deposit of funds reflecting Ballard's payment, the disbursement log's total of $4,155.35 included the $137.50, as did the deposit to the operating account.

The trust account transactions list, created by Fuller, reflects a "personal spending" deduction from Hughes' trust account on December 27, 2010, in the amount of $137.50. So, on December 27, 2010, Fuller directed the transfer of $137.50 from the trust account to the operating account, and on that same day, a deduction in that same amount was made by Fuller from Hughes'

10

personal funds. Yet, there was no deduction made from Ballard's trust account for this amount.[7]

Thus, Miller concluded that Fuller covered up the theft of Ballard's $137.50 deposit by another

transfer from Hughes' account.

### E. The Aftermath

Following Miller's investigation, Fuller's employment was terminated. Fuller ultimately

received unemployment compensation benefits after a contested hearing before the Texas

Employment Commission. The Commission determined that no misconduct had been established.

Fuller also sued Diversicare and received a $16,000.00 settlement.[8] At some point after Fuller was

terminated, Brentwood changed its receipting and posting systems. From January 2011, when

Fuller's employment was terminated, to July 2013, when the new system was implemented, no

further problems with the trust account were observed.

After hearing all the evidence at trial, the jury found Fuller guilty of theft of more than

$1,500.00 and less than $20,000.00 as charged in the indictment. The trial court then entered its

judgment notwithstanding the verdict acquitting Fuller of the charges. The State timely filed this

appeal.

---

[7]A similar transaction happened in October 2010 involving a check. Miller did not find any checks that Fuller endorsed or deposited into her own account.

[8]After her termination, Fuller filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC) alleging that her employment was terminated due to her race. In her lawsuit against Diversicare, Fuller alleged that Diversicare retaliated against her for filling the EEOC claim by opposing her claim for unemployment compensation benefits and by reporting the matter of the missing funds to the police.

## II.    Standard of Review

"Where the trial court, as in this case, enters a judgment notwithstanding the verdict, we treat it as the functional equivalent of an order granting a motion for new trial for insufficient evidence." *In re State*, 2015 WL 545838, at *1 (citing *Savage*, 933 S.W.2d at 499). "A motion for new trial based on insufficiency of the evidence presents a legal rather than a factual question, and the trial court must apply the same legal test as that employed by the appellate court." *State v. Savage*, 905 S.W.2d 272, 274 (Tex. App.—San Antonio 1995), *aff'd*, 933 S.W.2d 497; *see also State v. Chavera*, 386 S.W.3d 334, 336 (Tex. App.—San Antonio 2012, no pet.). "The trial court must decide, after viewing the evidence in the light most favorable to the verdict, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *Savage*, 905 S.W.2d at 274; *see also Chavera*, 386 S.W.3d at 336. "If the evidence meets the standard, it is an abuse of discretion for the trial court to grant the motion for new trial." *Savage*, 905 S.W.2d at 274.

In evaluating legal sufficiency in this case, we must review all the evidence in the light most favorable to the jury's verdict to determine whether any rational jury could have found, beyond a reasonable doubt, that Fuller committed the offense. *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)); *Hartsfield v. State*, 305 S.W.3d 859, 863 (Tex. App.—Texarkana 2010, pet. ref'd) (citing *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007)). We examine legal sufficiency under the direction of the *Brooks* opinion, while giving deference to the responsibility of the jury "to fairly resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from basic facts

to ultimate facts." *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007) (citing *Jackson*, 443 U.S. at 318–19).

Legal sufficiency of the evidence is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). The hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Id*.; *see Allen v. State*, 436 S.W.3d 815, 818 (Tex. App.—Texarkana 2014, pet. ref'd).

### III. Analysis

Under the general theft statute Fuller was charged with violating, the State had the burden to establish that (1) Fuller, (2) with intent to deprive Hughes of property, (3) unlawfully appropriated property (4) without the effective consent of Hughes. *See* Act of May 29, 2011, 82d Leg., R.S., ch. 1234, § 21, sec. 31.03(e)(4)(A), 2011 Tex. Gen. Laws 3302, 3310–11 (amended 2015).

#### A. Unlawful Appropriation

Fuller first maintains that the record fails to demonstrate that she appropriated funds belonging to Hughes. Fuller reasons that because she merely transferred funds from the trust account into the operating account and because she had no access to the funds after the transfer, she could not have appropriated funds belonging to Hughes. Indeed, the testimony developed at trial established the fact that once Fuller transferred funds from the trust account to the operating account, she had no further access to the funds. Only Neisler or a corporate representative had

13

access to the funds in the operating account. Moreover, the funds Fuller transferred from Hughes' trust account to the operating account were still intact in the operating account when the audit was conducted. Ultimately, Brentwood paid the missing funds back into Hughes' trust account. Fuller thus maintains that "Hughes' funds were never taken by Fuller. These funds were at all times in [Brentwood's] operating account and never accessed by Fuller."

The issue, however, is not whether Fuller physically pocketed Hughes' funds. The issue is whether Fuller unlawfully appropriated those funds. "Appropriate" means "to acquire or otherwise exercise control over property other than real property," TEX. PENAL CODE ANN. § 31.01(4)(B) (West Supp. 2014), and has been interpreted to mean "*any* 'exercise of control over' the personalty in question." *McClain v. State*, 687 S.W.2d 350, 353 n.7 (Tex. Crim. App. 1985) (quoting Act of June 2, 1975, 64th Leg., R.S., ch. 342, § 9, 1975 Tex. Gen. Laws 912, 914 (amended 1985, 1993, 1997, 2003, 2011) (current version at TEX. PENAL CODE ANN. § 31.01(4)(B))). Consequently, appropriation encompasses conduct that does not involve possession. *Gorman v. State*, 634 S.W.2d 681, 683 (Tex. Crim. App. 1982). "[T]he crucial element of theft is the deprivation of property from the rightful owner, without the owner's consent, regardless of whether the defendant at that moment has taken possession of the property." *Stewart v. State*, 44 S.W.3d 582, 588 (Tex. Crim. App. 2001) (en banc).

In *Stewart*, the defendant threatened to release nude photographs of the complainant unless she paid him $5,000.00 within forty-eight hours. *Id*. at 584. As a part of a sting operation, the complainant delivered money to a detective in the Conroe Police Department, who then had the funds delivered to the defendant at his home. Stewart was arrested as he was leaving his home

14

with the money in hand. *Id*. The issue before the court was the time at which the theft was complete: the time the complainant transferred the money to the authorities because of Stewart's threats or the time at which Stewart received the funds. *Id*. at 585. The Court of Criminal Appeals held that even though Stewart did not take the money, his threats leading to the release of the money amounted to an exercise of control over the money. *Id*. at 586–89. Consequently, the theft was complete when Stewart caused the complainant to release the money to the authorities. *Id*. at 589.

Here, Fuller exercised control over Hughes' funds by transferring those funds to the operating account to conceal her actions in failing to deposit cash delivered to Brentwood on behalf of residents Lawler, Boswell, and Ballard. Miller testified that the sums of $1,416.84, $2,031.00, and $137.50 were never deposited into the trust account at the local bank. Fuller was the person responsible for making those deposits. Miller further testified that money from Hughes' trust account was used to pay Brentwood's operating account for the missing deposits and that, as a result, the funds were not available for use by Hughes.

The documentary evidence substantiates Miller's testimony. The State produced copies of resident receipts for the missing sums of money. Bank deposit records for the months of July and December 2010—the months the funds at issue were received by Brentwood—do not reflect deposits of the money documented as having been received by Brentwood. Yet, trust fund check disbursement records created by Fuller and checks written by Fuller indicate that the missing sums were paid into the operating account and were allocated to the residents on whose behalf they were delivered to Brentwood.

15

Finally, and key to our determination that Fuller exercised control over Hughes' funds, are trust fund transaction list entries—also created by Fuller—which reflect deductions from Hughes' trust account for the non-deposited funds. The date of each deduction coincides with the date that Fuller created the trust fund check disbursement records. Consequently, Hughes' trust fund account records indicate that his trust account balance was $8,864.52 on July 7, 2010. The account balance dropped to $5,416.68 on July 16, 2010, after a deduction by Fuller of $3,447.84 for a room and board payment Hughes did not owe.[9] Despite the fact that Fuller did not have actual possession of Hughes' trust account funds, these facts plainly indicate that she exercised control over Hughes' property, thereby depriving him of that property without his consent. The fact that Brentwood replenished Hughes' trust account after the audit does not change the fact that Fuller unlawfully appropriated Hughes' funds.[10]

Fuller nevertheless maintains that the transfer of funds from the trust account to the operating account was within the scope of her authority as a bookkeeper for Brentwood and, thus,

---

[9]Fuller relies on *Rosenbush v. State*, 122 S.W.2d 1071, 1072 (Tex. Crim. App. 1938), in support of her position that she did not unlawfully appropriate Hughes' trust fund monies. In that case, the accused evidently tried to steal a calf, but the calf escaped with the accused's rope hanging from its neck. The court held that there was no theft, because "in order to constitute theft[,] . . . the property must come into the possession of the accused, either actually or constructively; and it must be reduced to his complete control and possession." This case pre-dates our current theft statute and specifically relates to the theft of an "animal on the range," stating that "in the case of theft of animals that the actual handling or manual possession is not necessary, still it has been held that the mere wounding of an animal on the range, and the pursuit of it without capture, is not considered to be a taking." *Id.*

[10]*See also Parnell v. State*, 339 S.W.2d 49, 50–51 (Tex. Crim. App. 1960), where the "Vice-President, Director, Member of the Executive Committee of the Board of Directors and head of the real estate committee" of an insurance company was found guilty of embezzlement by causing the insurance company to transfer funds to an investment company—of which he was "also President and a Director"—in order to pay off two of the Insurance company's bank loans secured by notes and deeds of trust on defendant's personal real estate. The Court of Criminal Appeals ruled that even though the defendant never personally received any money, he received the benefit of the release of liens on his real estate and that "a withdrawal by him for purposes of his own constitutes appropriation." *Id.* at 55.

16

was lawful activity. In support of this position, Fuller relies on *Huff v. State*, 897 S.W.2d 829 (Tex. App.—Dallas 1995, pet. ref'd), a case in which Huff, the company bookkeeper, paid her personal bills with company checks and made unauthorized petty cash withdrawals. *Id*. at 833. The court in *Huff* recognized that "in cases alleging theft of property by an employee or fiduciary, theft may be established by showing the employee or fiduciary did not have authority to dispose of or appropriate the property in the manner alleged." *Id*. at 834; *see also Newman v. State*, 115 S.W.3d 118, 121 (Tex. App.—Texarkana 2003, no pet.) (recognizing that "in the employer-employee context, an unlawful appropriation occurs when an employee exercises unauthorized control over the property belonging to the employee's employer") (citing *Freeman v. State*, 707 S.W.2d 597, 605 (Tex. Crim. App. 1986)). These cases do not advance Fuller's position for at least two reasons: (1) Fuller was not indicted or tried for theft from her employer, and (2) while Fuller may have been authorized, in her position as a bookkeeper for Brentwood, to transfer funds from the trust account to the operating account, she certainly was not authorized to transfer those funds so as to deplete Hughes' account in an attempt to cover up stolen deposits.

Fuller also points out a number of flaws in the receipting system as well as apparent flaws in Miller's audit. The jury was presented with detailed testimony regarding those matters, and we must defer to their weighing of the evidence and resolution of any conflicts in the testimony. *Hooper*, 214 S.W.3d at 13. We find that the evidence was legally sufficient to establish that Fuller unlawfully appropriated Hughes' property.

### B. Intent to Deprive

Fuller further contends that because she merely transferred funds from one account to another and because Hughes' trust account was appropriately credited in the end, she could not have intended[11] to deprive[12] Hughes of his property. To the extent Fuller suggests that intent to deprive cannot be proved in the absence of actual deprivation, she is incorrect. "The State need not prove actual deprivation in order to prove intent to deprive," and "while evidence of actual deprivation may be evidence of intent to deprive, other evidence may also indicate whether intent to deprive exists." *Rowland v. State*, 744 S.W.2d 610, 612 (Tex. Crim. App. 1988) (en banc); *see Brown v. State*, 294 S.W.3d 203, 208 (Tex. App.—Texarkana 2009, no pet.) (actual taking not required to prove intent to commit theft).

The issue of Fuller's intent is a fact question for the jury. Intent is typically proven through circumstantial evidence, *see Robles v. State*, 664 S.W.2d 91, 94 (Tex. Crim. App. 1984), and may be inferred from Fuller's acts, words, and conduct. *See Guevara v. State*, 152 S.W.3d 45, 50 (Tex. Crim. App. 2004); *Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981) (intent to deprive determined from acts or words of accused); *King v. State*, 174 S.W.3d 796, 810 (Tex. App.—Corpus Christi 2005, pet. ref'd) (intent to deprive determined from words and acts of accused).

---

[11]"A person acts intentionally, or with intent, with respect to the nature of her conduct or to a result of her conduct when it is her conscious objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (West 2011).

[12]"Deprive" means "to withhold property from the owner permanently or for so extended a period of time that a major portion of the value or enjoyment of the property is lost to the owner" or "to dispose of property in a manner that makes recovery of the property by the owner unlikely." TEX. PENAL CODE ANN. § 31.01(2)(A), (C) (West Supp. 2014).

The evidence is that Fuller failed to deposit cash funds delivered to her on behalf of residents Lawler, Boswell, and Ballard. She then attempted to hide this fact by diverting funds from Hughes' trust account and crediting those funds to Lawler, Boswell, and Ballard. This was done on more than one occasion. Hughes' trust account balance dropped each time Fuller deducted funds not owed by Hughes from that account. A rational fact-finder could have inferred that Fuller acted with intent to deprive Hughes of his trust account funds.

## IV. Conclusion

After considering the evidence in the light most favorable to the verdict, we conclude that a rational trier of fact could have concluded beyond a reasonable doubt that Fuller appropriated the funds from Hughes' account with the intent to deprive Hughes of those funds. Accordingly, we find that the evidence is legally sufficient to support Fuller's conviction of theft.[13] The trial court, therefore, did not have the discretion to grant Fuller's motion for new trial. We reverse the

---

[13]Fuller did not raise an issue regarding the sufficiency of the evidence to show lack of consent. Even so, lack of effective consent is a necessary element of theft. *See* TEX. PENAL CODE ANN. § 31.03. As with other criminal offenses that require a lack of effective consent, it may be proven solely by circumstantial evidence. *See, e.g.*, *Wells v. State*, 608 S.W.2d 200, 203 (Tex. Crim. App. 1980); *Williams v. State*, 591 S.W.2d 873, 875 (Tex. Crim. App. 1979) (lack of consent by owner to appropriation of store merchandise proven by circumstantial evidence); *Taylor v. State*, 508 S.W.2d 393, 397 (Tex. Crim. App. 1974) (proof of lack of consent to entry and taking of personal property in prosecutions for theft may be made by circumstantial evidence). Here, the evidence established that Hughes was a resident of Brentwood, that he was sixty-four years old, that he does not communicate well, and that he "does not have a lot of words." It is believed that Hughes suffered a stroke at some point in the past. This is circumstantial evidence of Hughes' inability to give consent. Further, the jury could have believed that Fuller's own actions demonstrated lack of consent.

trial court's order and remand to the trial court with instructions to enter a judgment of conviction

according to the jury's verdict and to proceed with a punishment hearing and sentencing.[14]


                                        Ralph K. Burgess
                                        Justice

Date Submitted:       September 1, 2015
Date Decided:         November 20, 2015

Publish

---

[14]The State requested in its brief that we remand this case to the trial court with the instruction to recall the original jury that found Fuller guilty to hear the punishment case as well. The State has pointed us to no authority authorizing such action, and we have found none. Accordingly, we deny the State's request to issue such an instruction to the trial court.