**Opinion issued September 14, 2021**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-19-00801-CV

———————————

**CASH AMERICA PAWN, LP, STEPHANIE FIELDS, AND ROBERT ELDER, Appellants**

**V.**

**RONALD L. ALONZO, Appellee**

---

**On Appeal from the 281st District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-54335**

---

## MEMORANDUM OPINION

This is an appeal from a judgment awarding damages in a malicious prosecution case. A jury found in favor of appellee Ronald L. Alonzo and awarded a total of $128,500 in damages (including $45,000 for past mental anguish), plus $100,000 in exemplary damages from appellant Cash America Pawn, L.P. ("Cash

America"). The jury also found in favor of Cash America on its counterclaims for fraud and breach of fiduciary duty, but it awarded zero damages on those claims.

Cash America, Stephanie Fields, and Robert Elder raise four issues on appeal, challenging: (1) the legal and factual sufficiency of the evidence to support the jury's liability finding on Alonzo's malicious prosecution claim; (2) the legal and factual sufficiency of the evidence to support the compensatory damages awarded to Alonzo; (3) the award of exemplary damages against Cash America in the absence of a predicate vice-principal finding; and (4) the sufficiency of the evidence to support the jury's finding of zero damages for fraud and breach-of-fiduciary duty.

We conclude that the evidence was insufficient to support the verdict on Alonzo's malicious prosecution claim. We further conclude that the jury's verdict finding zero dollars for lost profit damages resulting from Alonzo's breach of fiduciary duty and fraud was not against the great weight and preponderance of the evidence. We reverse the trial court's judgment awarding damages based on malicious prosecution and render judgment that Alonzo take nothing on his claim for malicious prosecution. We affirm the remainder of the judgment.

## Background

### I.     Cash America operates pawn shops.

Cash America owns and operates pawn shops across the country, including Store No. 86 in Katy, Texas. Its business model includes earning interest on pawn

2

loans of personal property, purchasing personal property directly from customers or wholesalers for resale, and making retail sales to customers by direct purchase or by layaway.

A pawn loan is a nonrecourse loan that is secured by personal property held as collateral. Cash America typically loans about 50-60% of the estimated resale value of the property based on its condition and as determined by research, experience, and internal software. Cash America does not permit its employees to make a loan for more than the resale value of the collateral.

The customer retains ownership of the collateral so long as the loan is not in default. Cash America retains possession of the collateral as its sole recourse if the customer defaults on the loan. A customer may (1) permit the loan to default and allow Cash America to take ownership of the collateral, (2) redeem the item by paying the principal and interest in full, (3) renew the loan by paying the accrued interest, (4) extend the loan by making a payment in exchange for additional time, or (5) pay down the loan by paying the accrued interest and part of the principal.

Cash America also sells property directly and by layaway. In a layaway sale, Cash America retains ownership of the property until the customer has paid in full. If a customer fails to make timely payments, the layaway is terminated, Cash America retains ownership of the personal property, and the customer receives a store credit for amounts paid.

3

## II.    Alonzo makes "wraparound" loans to Santana.

Alonzo was the assistant manager of Store No. 86, where Paola Santana worked as a pawnbroker and was also a customer. In May 2016, Santana had approximately ten pawn loans in danger of defaulting and seven items on layaway at Store No. 86.[1] Wanting to save her loans and layaways, Santana asked Alonzo for help.

Alonzo agreed to execute a series of transactions for her, on the condition that no money or merchandise would leave the shop. The series of transactions took about an hour and was recorded by a camera in the store and by entries he made in the computer. First, without receiving any money from Santana, Alonzo credited her layaway account for the total outstanding balance of the layaways. Then he made six new pawn loans using as collateral the property that had been on layaway. The six loans came to a total of $6,500, which was well above the resale value of the layaway items, which was approximately $2,000 to $3,000.[2] The $6,500 was applied first to the layaway payments on the seven items that were used as collateral on the May 28 pawn loans, and second to renewal payments on Santana's pre-existing

---

[1]    According to Robert Elder, an investigator for Cash America, Santana was already in default on her layaways on May 28.

[2]    At trial, Alonzo testified that the layaway items totaled $3,049, but Cash America employees Robert Elder and Aaron Hoffstadter testified that the remaining debt on the layaway $2,080, and the $3,049 figure was a sum of the retail value of the items, not the price for which they actually sold.

4

pawn loans. None of the property involved left the store, and all of the money involved remained in the possession of Cash America.

## III. Cash America investigates, and the district attorney charges Alonzo with theft.

Stephanie Fields began working for Cash America as a district manager in May 2016. After completing on-the-job training, in August 2016, she assumed responsibility for multiple stores, including Store No. 86. She noticed that Store No. 86 had made loans that exceeded the resale value on several items. On August 16, 2016, Fields requested a report showing all customers at Store No. 86 with a loan balance exceeding $10,000. Santana appeared on this report because she had $26,141 in outstanding pawn loans. Fields asked Robert Elder, one of Cash America's investigators, to help her investigate the loans to Santana. Elder had more than 30 years' experience in law enforcement and investigations prior to working for Cash America. Fields and Elder reviewed documents from Store No. 86 (including the pawn and layaway tickets for the wraparound loans that Alonzo executed for Santana) and watched the video recording that showed Alonzo and Santana conducting the transactions in a back office. Elder interviewed Alonzo and Santana; Fields was present and observed the interviews but did not ask questions.

Alonzo acknowledged that he made the transactions, but he maintained that he had done nothing wrong. Alonzo said that there was no theft, "everything was

accounted for," and he had previously made "overloans" for Santana. Alonzo's employment was immediately terminated.

Santana admitted that she and Alonzo "manipulated the transactions in order to cover her previous loans." Santana told Elder that she gave Cash America no money for the layaway items. Santana's employment was also terminated.

Fields and Elder concluded that the wraparound transactions conducted by Alonzo and Santana were theft. Elder believed that he had probable cause that a theft had occurred based on the admissions in the interviews and his investigation.[3] He consulted with his supervisor and with Fields, and they agreed that it was appropriate to report a theft to law enforcement.

Elder called the Harris County Sheriff's Office to report a theft, and Deputy Ganaway responded to the store. Elder told Deputy Ganaway that, based on his investigation, he believed that "items that belonged to Cash America had been converted to loans prior to those items being paid for and that the value that was loaned on them was over the amount that they were worth . . . ." Elder believed that the difference between the value of the property, approximately $2,000, and the loan made to Santana, $6,500, was the amount of money that had been appropriated from Cash America. He told Deputy Ganaway that no money left the store. Deputy

---

[3]     Both Fields and Elder testified that in addition to the paper transactions, there was a deficit of $700 from Store No. 86 that could not be accounted for.

6

Ganaway advised Elder that he, too, believed that a felony theft had occurred and that he would take the information to the district attorney and request criminal charges for felony theft. At trial, Elder testified: "I advised him that wasn't my decision, that's completely within the purview of the Harris County Sheriff's Office. And the deputy proceeded to go about his way." Thereafter, Deputy Ganaway contacted Elder and informed him that charges had been filed.

In late August 2016, Alonzo learned that there was a warrant for his arrest, and he reported to a police station for booking. In January 2017, the case against him was dismissed. In May 2017, the record was expunged.

## IV.  Alonzo sues Cash America, and the jury awards damages for malicious prosecution.

Alonzo sued Cash America, Fields, and Elder for malicious prosecution, seeking compensatory and exemplary damages.[4] Cash America filed counterclaims for breach of fiduciary duty, fraud, and money had and received. It sought compensatory and exemplary damages as well as attorney's fees.

At trial, Alonzo admitted that he completed the wraparound transactions on Santana's behalf and confirmed the details. He also admitted that Santana paid nothing toward the satisfaction of the layaway debt, and that all of the money

---

[4]     Alonzo also sued for defamation, and intentional infliction of emotional distress. The trial court granted summary judgment in favor of Cash America, Fields, and Elder on the cause of action for intentional infliction of emotion distress. Alonzo abandoned his defamation claim at trial.

7

involved in the wraparound transaction came from Cash America. Alonzo maintained that no money was lost in the transaction because all the money that Cash America loaned to Santana was returned to Cash America as renewal, extension, or layaway payments. According to Alonzo, at the end of that day, all the money in his master cash drawer was accounted for and showed no discrepancies.

Alonzo testified that the theft charge affected him professionally and personally. He was denied unemployment benefits, and although he had been looking, he had not found a job. Alonzo said that due to state licensing requirements, he could not work at a pawn shop if he had a pending felony charge or a felony conviction. However, he conceded that he had applied for a job only about once every two months since he left Cash America. Personally, he felt like a disappointment when explaining the felony charge to his family. He also said that he was ostracized by people in the pawn industry, who treated him "like a thief."

On cross-examination, Alonzo was asked what evidence he had that Elder and Fields were trying to hurt him by notifying the police of their belief that a theft had occurred:

> The only evidence I have is that—what personally happened to me. If I broke company policy, then I should have just been terminated and that was it. I didn't have to go through criminal charges of the—of a felony charge. I wouldn't have had to have gone through all that.

Elder and Fields both testified at trial that based on their investigation they believed—and continued to believe—that Alonzo had committed theft by exercising

8

control over Cash America's money for the purpose of paying Santana's layaway charges. Neither Fields nor Elder had met Alonzo before the investigation, and Elder testified that he had "no reason" to dislike or target him.

Elder testified that he did not omit any relevant information or give inaccurate or false information to Deputy Ganaway, although he disagreed with many statements in Deputy Ganaway's probable cause affidavit. Elder denied having told Deputy Ganaway that Santana owed $6,500 to the store prior to the transaction, that her loan balance was reduced to zero after pawning the layaway items for $6,500, and that the suggested loan amount for all the layaway items was $1700.

At trial, Aaron Hoffstadter, a regional manager for Cash America, testified about the business, generally, and he explained a summary report, which had been admitted into evidence and which showed the payment of the layaways and issuance of new pawn loans in May 2016. Hofstadter explained that the total of the retail prices for the layaway items was $3,049, but the sales price had been discounted to a total of $2,080. Hoffstadter agreed that the layaway-to-loan transactions constituted theft. He testified that after Santana defaulted, Cash America resold two of the layaway items at a loss, and the other items were sent to scrap metal reclamation. Hoffstadter testified: "Cash America ultimately lost approximately $4,500 at the time of disposition."

The jury found in favor of Alonzo on his malicious prosecution claim, and it found the following amounts for compensatory damages: (1) $5,500 criminal defense legal fees; (2) $45,000 past mental anguish; (3) $42,000 past loss of earnings; (4) $24,000 past injury to reputation; (5) $12,000 future injury to reputation. The jury found by clear and convincing evidence that the harm to Alonzo from the malicious prosecution resulted from malice, which was defined as "a specific intent by Defendants to cause substantial injury or harm." The jury awarded $100,000 in exemplary damages. The jury also found that Alonzo failed to comply with his fiduciary duty to Cash America and committed fraud against Cash America. The jury awarded zero dollars in damages for breach of fiduciary duty and fraud.

## Analysis

In their first issue, appellants challenge the legal and factual sufficiency of the evidence to support the judgment for Alonzo. Their second and third issues challenge the awards of compensatory and exemplary damages. The fourth issue asserts that the jury's award of zero damages for fraud and breach-of-fiduciary duty was contrary to the overwhelming weight of the evidence, which conclusively established that Cash America sustained actual damages of $4,500.

## I. Standards of review

### A. Legal sufficiency

When an appellant challenges the legal sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014). "In reviewing a verdict for legal sufficiency, we credit evidence that supports the verdict if reasonable jurors could, and disregard contrary evidence unless reasonable jurors could not." *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006) (citing *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005)). We will sustain a legal sufficiency challenge if the record shows that: (1) there is a complete absence of evidence of a vital fact, (2) rules of law or evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a scintilla, or (4) the evidence establishes conclusively the opposite of the vital fact. *City of Keller*, 168 S.W.3d at 810. "Evidence does not exceed a scintilla if it is 'so weak as to do no more than create a mere surmise or suspicion' that the fact exists." *Suberu*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

**B. Factual sufficiency**

When an appellant challenges the factual sufficiency of the evidence supporting an adverse finding on an issue on which it did not have the burden of proof, it must demonstrate that the adverse finding is so contrary to the overwhelming weight of the evidence as to be clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Levine v. Steve Scharn Custom Homes, Inc.*, 448 S.W.3d 637, 653 (Tex. App.—Houston [1st Dist.] 2014, pet. denied). In conducting a factual-sufficiency review, we examine, consider, and weigh all the evidence that supports or contradicts the factfinder's determination. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 242 (Tex. 2001); *Plas-Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex. 1989). The jury is the sole judge of the witnesses' credibility, and a reviewing court may not substitute its opinion to the contrary. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

**II.    The evidence is insufficient to support the jury's verdict on malicious prosecution.**

The appellants challenge the sufficiency of the evidence to support the jury's verdict that that they are liable for malicious prosecution. They specifically argue that the evidence is legally and factually insufficient to support three elements of a claim for malicious prosecution: malice, lack of probable cause, and initiation or

procurement of a criminal proceeding. Because it is dispositive, we focus on the element of lack of probable cause.

## A. Cause of action for malicious prosecution

"Actions for malicious prosecution create a tension between the societal interest in punishing crimes and the individual interest in protection from unjustifiable criminal prosecution." *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 520 (Tex. 1997). "Even a small departure from the exact prerequisites for liability may threaten the delicate balance between protecting against wrongful prosecution and encouraging reporting of criminal conduct." *Browning–Ferris Indus., Inc. v. Lieck*, 881 S.W.2d 288, 291 (Tex. 1994). To prevail on a claim of malicious prosecution, a plaintiff must establish: (1) the commencement of a criminal prosecution against the plaintiff; (2) that was initiated or procured by the defendant; (3) the termination of the prosecution in the plaintiff's favor; (4) the plaintiff's innocence; (5) the defendant's lack of probable cause to initiate the proceedings; (6) malice in filing the charge; and (7) damage to the plaintiff. *Suberu*, 216 S.W.3d at 793 n.3; *Richey*, 952 S.W.2d at 517; *Espinosa v. Aaron's Rents, Inc.*, 484 S.W.3d 533, 542 (Tex. App.–Houston [1st Dist.] 2016, no pet.).

## B. Lack of probable cause

"The probable cause inquiry asks only whether the complainant reasonably believed that the elements of a crime had been committed based on the information

13

available to the complainant before criminal proceedings began." *Richey*, 952 S.W.2d at 519. "[T]here is an initial presumption in malicious prosecution actions that the defendant acted reasonably and in good faith and had probable cause to initiate the proceedings." *Id* at 517. "The presumption disappears if a plaintiff produces evidence that the motives, grounds, beliefs, and other evidence upon which the defendant acted did not constitute probable cause." *Buckingham Senior Living Cmty., Inc. v. Washington*, 605 S.W.3d 800, 811 (Tex. App.—Houston [1st Dist.] 2020, no pet.) (citing *Richey*, 952 S.W.2d at 517–18). The burden then shifts to the defendant to offer proof of probable cause. *Buckingham Senior Living*, 605 S.W.3d at 811 (citing *Richey*, 952 S.W.2d at 517–18). Probable cause cannot be overcome by evidence that the defendant failed to fully disclose all relevant facts,[5] the

---

[5] *First Valley Bank of Los Fresnos v. Martin*, 144 S.W.3d 466, 470 (Tex. 2004) ("Once a citizen has probable cause to report a crime, there can be no malicious prosecution, even if the subsequent report fails to fully disclose all relevant facts.").

defendant failed to make additional investigation into the suspect's state of mind,[6] or the criminal charges were subsequently resolved by dismissal[7] or acquittal.[8]

**C.    The evidence is legally insufficient to show that the appellants lacked probable cause when reporting the suspected theft.**

The appellants argue that the evidence is legally and factually insufficient to support a finding that they lacked probable cause when they reported the theft. They maintain that the evidence discovered during their investigation led to their reasonable belief that Alonzo had committed a theft. Alonzo maintains that there was no theft, and no probable cause, because there were no cash shortages, and no property went missing. We consider these arguments in light of the law regarding theft.

---

[6]    *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 518 (Tex. 1997); *Marathon Oil Co. v. Salazar*, 682 S.W.2d 624, 627 (Tex. App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.) ("A private citizen has no duty to inquire of the suspect whether he has some alibi or explanation before filing charges.").

[7]    *Buckingham Senior Living Cmty., Inc. v. Washington*, 605 S.W.3d 800, 811 (Tex. App.—Houston [1st Dist.] 2020, no pet.) ("The dismissal of criminal charges is no evidence that George lacked probable cause at the time she assisted in reporting the offense.").

[8]    *Kroger Tex. Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 794 (Tex. 2006) ("To rebut the probable cause presumption, Suberu had to produce evidence that the motives, grounds, beliefs, or other information upon which Kroger acted demonstrate that it did not reasonably believe Suberu was guilty of shoplifting. [citations omitted] While Suberu's evidence supports the jury's determination—consistent with her acquittal—that she did not steal groceries, it does not establish the absence of probable cause.").

### 1. Theft is unlawful appropriation of property.

Under the Texas Penal Code, a person commits the offense of theft "if he unlawfully appropriates property with intent to deprive the owner of property." TEX. PENAL CODE § 31.03(a). As relevant to this case, "[a]ppropriation of property is unlawful if . . . it is without the owner's effective consent . . . ." *Id.* § 31.03(b). "Appropriate" means: "(A) to bring about a transfer or purported transfer of title to or other nonpossessory interest in property, whether to the actor or another; or (B) to acquire or otherwise exercise control over property other than real property." *Id.* § 31.01(4). "[A]ppropriation encompasses conduct that does not involve possession." *State v. Fuller*, 480 S.W.3d 812, 820 (Tex. App.—Texarkana 2015, pet. ref'd). An unlawful appropriation may be of any duration. *See Davis v. State*, No. 01-17-00587-CR, 2019 WL 1179429, at *6 (Tex. App.—Houston [1st Dist.] Mar. 14, 2019, pet. ref'd) (mem. op.; not designated for publication).

### 2. Application of the law to the facts.

We begin with the presumption that the appellants acted reasonably and in good faith and had probable cause to initiate the proceeding. *See Richey*, 952 S.W.2d at 517. We consider whether Alonzo produced evidence that the information and beliefs that the appellants acted on did not constitute probable cause. *See Buckingham Senior Living*, 605 S.W.3d at 811. Then, we consider whether the appellants met their burden. To show that there was no evidence that they lacked

probable cause (a double negative), the appellants must demonstrate that the evidence conclusively proves that they had probable cause to believe that Alonzo had committed theft when they made the report to the sheriff's office. *See Richey*, 952 S.W.2d at 519.

### a) Evidence that the appellants relied on

The evidence adduced at trial showed that the appellants relied on documentary proof of the wraparound transactions that showed Alonzo transferring Cash America's funds to pay for Santana's layaways. They also relied on the video recording that showed Alonzo and Santana together at the time the transactions were made, and their interviews with Alonzo and Santana. According to Fields and Elder, both Alonzo and Santana admitted their roles in the wraparound transactions. Alonzo denied having admitted his role to them during the investigation.

### b) Alonzo's evidence

Alonzo relies on evidence that no property or money left the store or Cash America's control. On appeal, as in the trial court, Alonzo focuses on proof that no money or goods were "taken" from Cash America or transferred to his or Santana's possession. None of this evidence negates probable cause. *See Fuller*, 480 S.W.3d at 820.

In *State v. Fuller*, the Texarkana Court of Appeals considered whether there was sufficient evidence of theft in a case where a nursing home bookkeeper had

17

made an unauthorized transfer of trust funds to an operating account. 480 S.W.3d at 814. The bookkeeper allegedly kept approximately $3,000 in cash that was intended for deposit into a trust account and transfer to an operating account as payment for two residents' room and board. *Id.* at 814–17. She was accused of concealing this act by transferring an equivalent amount of money from another resident's trust funds into the operating account.[9] *Id.* When the deception was discovered, the bookkeeper was charged with theft based on the transfer of trust funds. *Id.* at 820. The bookkeeper maintained that she did not commit theft because she merely transferred funds from the trust account to the operating account, the funds were still intact at the time of the investigation, and the money was returned to the resident's trust fund. *Id.* Thus, she contended that she never took the funds. *Id.*

The court of appeals stated that the determinative issue is not whether the bookkeeper "physically pocketed" the resident's funds, but whether she "unlawfully appropriated" the money. *Id.* at 820. It also rejected the bookkeeper's argument that because she merely transferred funds from one account to another and because the money was ultimately refunded, there was no proof that she intended to deprive the resident of his money. *Id.* at 822. The court of appeals noted that evidence of actual deprivation is not necessary to prove intent to deprive. *Id.* The court concluded that

---

[9] The other resident's room and board were paid directly by Medicaid, and his trust fund balance was over $8,000 because he had received a lump-sum, retroactive payment for social security disability benefits.

the evidence was legally sufficient to support the jury's verdict that the bookkeeper committed theft. *Id.* at 823.

This case is similar to *Fuller*. Both cases involve a transfer of funds from one account to another. Both cases involve an unauthorized exercise of control over money belonging to another. In *Fuller*, although the bookkeeper generally had authority to transfer money from the trust account to the operating account, she did not have the effective consent of the resident to transfer money from the trust account. In this case, although Alonzo, as an assistant manager, generally had some authority over Cash America's funds, for example for making pawn loans, he did not have the effective consent of Cash America to use its money to pay Santana's layaway debt. It does not matter that neither Alonzo nor Santana physically possessed the money or property involved in this transaction. *See id.*

### c) Conclusive proof of probable cause

In this case, the evidence showed the existence of the wraparound transactions and that Fields and Elder believed that both Alonzo and Santana had admitted to engaging in conduct whereby Alonzo exercised control over Cash America's money in a manner for which he lacked effective consent. We conclude that as a matter of law, based on these facts proven at trial, the appellants reasonably believed that the elements of theft had been committed at the time they reported the alleged theft to the sheriff's office. *See Richey*, 952 S.W.2d at 519.

We hold that there was no evidence that the appellants acted in the absence of probable cause, and therefore the evidence is legally insufficient to support the jury's malicious prosecution verdict. We sustain the appellants' first issue, and we do not need to consider the second and third issues. *See* TEX. R. APP. P. 47.1. We reverse the judgment in favor of Alonzo for malicious prosecution and render judgment that he take nothing on that claim.

### III.    The zero damages award on breach of fiduciary duty and fraud is not contrary to the overwhelming weight of the evidence.

Cash America challenges the factual sufficiency of the evidence to support the jury's finding of zero damages for both breach of fiduciary duty and fraud. It argues that the overwhelming evidence showed that it suffered a financial loss of $4,500, which is the approximate difference between the amount of the loans and the resale value of the collateral.

When, as here, the appellant challenges the factual sufficiency of the evidence supporting an adverse finding on which it had the burden of proof, the appellant must demonstrate that the adverse finding is against the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242.

The jury found that Alonzo breached his fiduciary duty to Cash America and committed fraud, but it assessed $0 in damages. The damages questions for both breach of fiduciary duty (question 7) and fraud (question 11) submitted only past and future lost profits as the measure of damages.

20

"Lost profits are damages for the loss of net income to a business measured by reasonable certainty." *Miga v. Jensen*, 96 S.W.3d 207, 213 (Tex. 2002). "To be recoverable, lost profits must be proven by competent evidence with reasonable certainty." *Texaco, Inc. v. Phan*, 137 S.W.3d 763, 771 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see ERI Consulting Eng's, Inc. v. Swinnea*, 318 S.W.3d 867, 876 (Tex. 2010). "Recovery for lost profits does not require that the loss be susceptible of exact calculation." *Holt Atherton Indus., Inc. v. Heine*, 835 S.W.2d 80, 84 (Tex. 1992). "However, the injured party must do more than show that [it] suffered some lost profits." *Id.* Opinions or estimates are competent evidence of lost profits if based on objective facts, figures, or data from which the amount of lost profits can be ascertained. *ERI Consulting Eng'rs*, 318 S.W.3d at 876; *Holt Atherton*, 835 S.W.2d at 84.

Cash America argues that its damages were the difference between the value of the collateral, approximately $2,000, and the amount loaned to Santana, $6,500, or $4,500. But the evidence does not indicate that Cash America suffered $4,500 in lost profits. To the contrary, the evidence established that Cash America could not have earned a profit of $4,500 from the sale of the collateral because it was worth far less.

The only mention of profit appears in Hoffstadter's testimony. He said that Cash America was eventually able to sell two of the seven items that had been on

layaway. One of those items was a watch that Santana had purchased on layaway for $65. After Santana's default, Cash America sold the watch for $20. This is not evidence of lost profits due to Alonzo's breach of fiduciary duty and fraud. The evidence showed that before the wraparound transactions, Santana was in default or nearing default on the layaway items. And nothing in the evidence showed that Cash America's sale of the watch for $20 was caused by Alonzo's actions. Likewise, the record does not address the possibility of future lost profits due to Alonzo's action. The evidence in the record does not prove with reasonable certainty any amount of past lost profits.

We hold that the jury's finding of zero lost-profit damages for breach of fiduciary duty and fraud was not contrary to the great weight and preponderance of the evidence. *See Dow Chem. Co.*, 46 S.W.3d at 242. We overrule Cash America's fourth issue.

## Conclusion

We reverse the trial court's judgment awarding damages based on malicious prosecution, and because all the damages awarded to Alonzo were based on malicious prosecution, we render judgment that Alonzo take nothing by way of this suit. The remainder of the trial court's judgment is affirmed.

Peter Kelly
Justice

Panel consists of Justices Kelly, Landau, and Hightower.