# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

## NO. 03-18-00122-CR

---

**The State of Texas, Appellant**

**v.**

**Gloria Elizabeth Romero-Perez, Appellee**

---

**FROM THE 207TH DISTRICT COURT OF COMAL COUNTY**
**NO. CR2016-659, THE HONORABLE GARY L. STEEL, JUDGE PRESIDING**

---

## M E M O R A N D U M   O P I N I O N

The State of Texas appeals from the district court's order granting the motion for new trial filed by appellee Gloria Elizabeth Romero-Perez, who was convicted of the offense of continuous trafficking of persons and sentenced to 25 years' imprisonment. *See* Tex. Penal Code § 20A.03. In two points of error on appeal, the State argues that the district court lacked jurisdiction to grant a new trial and, in the alternative, abused its discretion in granting Romero-Perez a new trial. Although we disagree with the State's assertion that the district court lacked jurisdiction to grant a new trial, we agree that in this case and on this record, the district court should have denied Romero-Perez's motion for new trial. Accordingly, we will reverse the district court's order.

## BACKGROUND

In a two-count indictment, the State charged Romero-Perez with the offenses of continuous trafficking of persons and sale or purchase of a child. Both offenses involved Romero-Perez's niece, A.L. (the child), who was fifteen years old at the time of the alleged offenses. Based on the evidence presented at trial, which we discuss in detail below, a jury convicted Romero-Perez of the trafficking offense but acquitted her of the offense of sale or purchase of a child. The jury then assessed punishment at 25 years' imprisonment.

At the conclusion of trial, the district court forgot to impose Romero-Perez's sentence in open court, *see* Tex. Code Crim. Proc. art. 42.03, § 1, and neither party noticed the oversight at that time. This resulted in a complicated post-trial procedural history, summarized in previous orders of this Court,[1] that included abating the appeal and remanding the case to the district court on four occasions, first for imposition of sentence and later for a hearing on a bill of exception filed by the State. *See* Tex. R. App. P. 33.2. Additionally, Romero-Perez filed and the district court granted two motions for new trial, before and after imposition of sentence. *See id*. 21.4(a), 21.8(a) (providing that deadlines for filing and ruling upon motion for new trial are calculated based on date *after* which trial court imposes or suspends sentence in open court). However, at the hearing on the State's bill of exception, the parties agreed to proceed only on the

---

[1] *See State v. Romero-Perez*, No. 03-18-00122-CR, 2019 Tex. App. LEXIS 3102 (Tex. App.—Austin Apr. 18, 2019) (per curiam order) (mem. op., not designated for publication); 2019 Tex. App. LEXIS 545 (Tex. App.—Austin Jan. 29, 2019) (per curiam order) (mem. op., not designated for publication); 2018 Tex. App. LEXIS 8149 (Tex. App.—Austin Oct. 5, 2018) (per curiam order) (mem. op., not designated for publication); 2018 Tex. App. LEXIS 4149 (Tex. App.—Austin June 8, 2018) (per curiam order) (mem. op., not designated for publication).

district court's order granting Romero-Perez's second motion for new trial.[2]  The State appeals

from that order.  *See* Tex. Code Crim. Proc. art. 44.01(a)(3); *see also* Tex. R. App. P. 27.1(b).

## ANALYSIS

### Jurisdiction

In its first point of error, the State asserts that the district court lacked jurisdiction

to grant Romero-Perez's second motion for new trial.  Specifically, the State contends that after

the appeal was reinstated in this Court following the district court's imposition of sentence, the

district court lost jurisdiction to take further action in the case, including granting a new trial.

---

[2]  Specifically, at the hearing, defense counsel for Romero-Perez represented, "And I want to make clear that we are asking the Court—since the Court of Appeals told us we're starting again, we are asking the Court not to consider the previous Motion for New Trial at all." Instead, defense counsel was relying on "the latest Motion for New Trial granted by the Court." The State, which had been arguing that the order on the first motion for new trial was "void" (a position that the State has maintained throughout this appeal), sought clarification from defense counsel: "Now if I understand [defense counsel] right, they're no longer relying on that [first] order." Defense counsel replied, "That's—that's correct." Later at the hearing, defense counsel reiterated, "I just want to clarify in the order procedurally so there's not any question of what we're dealing with that the Motion for New Trial order—or the Motion for New Trial that we're talking about is the latest one that was filed, not the one filed prior to" imposition of sentence. The State indicated its assent to proceeding on the second order, and the district court summarized the parties' understanding as follows: "So it sounds like, just for the record, the prosecutor; defense counsel; and the Court's understanding is that we are proceeding on the new Motion for New Trial and that the previous Motion for New Trial, which was done before pronouncement, is moot."

Defense counsel maintains in her brief on appeal that at this hearing, "both parties agreed to proceed on the appeal of the second order and agreed that Order 1 was moot." Additionally, in her second motion for new trial, Romero-Perez represented that she was proceeding on the second motion "without reliance on or re-urging of any Motion for New Trial previously considered by the trial court." Based on these representations, we conclude that Romero-Perez has waived any reliance on the district court's order granting her first motion for new trial, and thus we need not address the State's arguments challenging that order. *See* Tex. R. App. P. 47.1.

3

The general rule is that "[o]nce the record has been filed in the appellate court, all further proceedings in the trial court . . . will be suspended until the trial court receives the appellate-court mandate." Tex. R. App. P. 25.2(g). However, the general rule is subject to exceptions "provided otherwise by law or by these [appellate] rules." *Id.* One such exception is that a trial court is permitted to rule on a timely filed motion for new trial when the appellate record has been filed prematurely. *See Taylor v. State*, 163 S.W.3d 277, 280–84 (Tex. App.—Austin 2005, pet. dism'd). It should not be "the trial court clerk and court reporter who decide when jurisdiction of a criminal case passes under the rules from the trial court to the appellate court," and "premature actions which could affect the times when courts lose or obtain personal jurisdiction of a case should be avoided, whether done inadvertently or by design." *Id.* at 281–82. Accordingly, this Court has declined to "interpret the jurisdictional bar of Rule 25.2(g) to foreclose the trial court's consideration of a timely filed motion for new trial." *Id.* at 282.

Additionally, it is well established that the appellate court may restore jurisdiction in the trial court by abating the appeal and remanding the case to the trial court for further action. *See* Tex. R. App. P. 44.4; *LaPointe v. State*, 225 S.W.3d 513, 520–22 (Tex. Crim. App. 2007); *Green v. State*, 906 S.W.2d 937, 940 n.4 (Tex. Crim. App. 1995); *Duncan v. Evans*, 653 S.W.2d 38, 40 (Tex. Crim. App. 1983). The trial court's jurisdiction upon remand is not unlimited, *see Lewis v. State*, 711 S.W.2d 41, 43 (Tex. Crim. App. 1986), but it includes the ability to hold a hearing on a motion for new trial in certain cases, *see Martinez v. State*, 74 S.W.3d 19, 21–22 (Tex. Crim. App. 2002), make findings of fact when the trial court is required by law to do so, *see State v. Cullen*, 195 S.W.3d 696, 698–99 (Tex. Crim. App. 2006), hold a hearing on any timely filed bill of exception, *see Spence v. State*, 758 S.W.2d 597, 599–600 (Tex. Crim. App. 1988), conduct other hearings as required by law, *see Hutchinson v. State*, 86 S.W.3d 636, 639–

4

40 & n.1 (Tex. Crim. App. 2002); *see also* Tex. R. App. P. 38.8(b), and impose or suspend a defendant's sentence in open court, *see Keys v. State*, 340 S.W.3d 526, 529 (Tex. App.—Texarkana 2011, no pet.).

Here, the district court's jurisdiction was restored when this Court abated the appeal and remanded the case to the district court for imposition of Romero-Perez's sentence in open court. *See* Tex. R. App. P. 44.4(b). In compliance with this Court's order, the district court imposed sentence in open court on February 5, 2019. The imposition of sentence triggered automatically the 30-day deadline for Romero-Perez to file a motion for new trial, *see id.* 21.4(a), and the 75-day deadline for the district court to rule on the motion for new trial, *see id.* 21.8(a). The record reflects that Romero-Perez timely filed her motion for new trial on March 6, 2019, and the district court timely granted that motion on March 12, 2019, via written order.

It is true, as the State observes, that the appeal was reinstated in this Court on March 7, 2019, before the trial court signed its order granting the second motion for new trial. However, the reinstatement occurred upon the premature filing in this Court of the appellate record. The record did not contain Romero-Perez's motion for new trial or the district court's order granting the motion for new trial, even though the district court informed the parties at the February 5, 2019 hearing that it would allow Romero-Perez either to re-urge her previous motion or file a new motion for new trial and that the court would give her a "new ruling" either way. *See id.* 21.6, 21.8; *see also id.* 34.5(a)(6) (providing that clerk's record must include "any post-judgment motion, and the court's order on the motion"); *see also id.* 35.2(c) (providing that if motion for new trial is granted, appellate record must be filed "within 60 days *after* the order granting the motion is signed" (emphasis added)). Romero-Perez filed and the district court ruled on the new motion for new trial within the time periods permitted by Rule 21.8(a), and we

5

cannot conclude in this case that the premature filing of the appellate record deprived the district court of jurisdiction to grant Romero-Perez's timely filed motion for new trial.[3] *See Taylor*, 163 S.W.3d at 281–82; *Gipson v. State*, 669 S.W.2d 351, 353 (Tex. App.—Fort Worth 1984, no pet.); *see also Bitterman v. State*, 195 S.W.3d 777, 779 (Tex. App.—Waco 2006, pet. ref'd) (holding that when defendant "timely filed his motion for new trial," "the trial court had jurisdiction to hear it"); *In re State ex rel. Sistrunk*, 142 S.W.3d 497, 503 (Tex. App.—Houston [14th Dist.] 2004, orig. proceeding) (discussing trial court's jurisdiction, including trial court's "inherent power to correct, modify, vacate, or amend its own rulings so long as the court does not exceed a statutory time table," which is "75 days after sentencing" for motions for new trial).

We overrule the State's first point of error.

---

[3] In arguing that the trial court lacked jurisdiction to grant a new trial, the State relies on this Court's opinion in *In re Escamilla*, 561 S.W.3d 711 (Tex. App.—Austin 2018, orig. proceeding). In that case, the trial court, after conducting an evidentiary hearing, granted the defendant's motion to set aside the verdict. *Id*. at 714. The State appealed. *Id*. Subsequently, the trial court, after it had lost jurisdiction over the case and without any authorization from this Court, scheduled an additional hearing on related matters in the case, including two applications for writ of habeas corpus asserting that any retrial would be barred by double jeopardy and a motion to disqualify the County Attorney's Office from prosecuting the case. *Id*. This Court prohibited the trial court from proceeding with that hearing, concluding that "[a]ny further action by the trial court relating to the subject matter of the State's appeal would contravene the properly invoked jurisdiction of this Court." *Id*. at 717.

This case is distinguishable from *Escamilla*. Here, the district court, in accordance with this Court's abatement orders, the Code of Criminal Procedure, and the Rules of Appellate Procedure, imposed Romero-Perez's sentence in open court, *see* Tex. Code Crim. Proc. art. 42.03, § 1, ruled on Romero-Perez's timely filed motion for new trial, *see* Tex. R. App. P. 21.8(a), and held a hearing on the State's timely filed bill of exception, *see id*. 33.2. Thus, unlike the trial court's actions in *Escamilla*, the district court's actions in this case were authorized by this Court and did not contravene this Court's jurisdiction.

**Merits of the motion**

In its second point of error, the State argues that the district court abused its discretion in granting Romero-Perez's second motion for new trial on the merits of the grounds alleged.[4] In this case and on this record, we agree.

### *Standard of review*

"We review a trial judge's ruling on a motion for new trial for an abuse of discretion." *International Fid. Ins. Co. v. State*, 586 S.W.3d 9, 12 (Tex. Crim. App. 2019) (citing *Burch v. State*, 541 S.W.3d 816, 820 (Tex. Crim. App. 2017); *State v. Herndon*, 215 S.W.3d 901, 906-07 (Tex. Crim. App. 2007)). "That discretion, however, is not unbounded or unfettered." *State v. Zalman*, 400 S.W.3d 590, 593 (Tex. Crim. App. 2013). "A trial judge does not have authority to grant a new trial unless the first proceeding was not in accordance with the law." *Herndon*, 215 S.W.3d at 907. "He cannot grant a new trial on mere sympathy, an inarticulate hunch, or simply because he personally believes that the defendant is innocent or 'received a raw deal.'" *Id*. "To grant a new trial for a non-legal or legally invalid reason is an abuse of discretion." *Id*. Thus, "a trial court would not generally abuse its discretion in granting a motion for new trial if the defendant: (1) articulated a valid legal claim in his motion for new trial;

---

[4] As noted earlier, *see supra* n.2, Romero-Perez represented in her second motion for new trial that she was proceeding on that motion "without reliance on or re-urging of any Motion for New Trial previously considered by the trial court." Consequently, the district court's order granting the second motion for new trial may be upheld, if at all, only on the grounds alleged in that motion. *See State v. Zalmon*, 400 S.W.3d 590, 594–95 (Tex. Crim. App. 2013) (concluding that trial court abused its discretion in granting motion for new trial on grounds not alleged in motion; "[w]e have repeatedly held that '[a]n essential element of [a motion for new trial] is that the matter of error relied upon for a new trial must be specifically set forth therein." (quoting *Harvey v. State*, 201 S.W.2d 42, 45 (Tex. Crim. App. 1947))); *State v. Provost*, 205 S.W.3d 561, 570 (Tex. App.—Houston [14th Dist.] 2006, no pet.) (observing that trial court has "no authority" to grant motion for new trial based on ground not raised in motion). Accordingly, we limit our review to those grounds. *See* Tex. R. App. P. 47.1.

(2) produced evidence or pointed to evidence in the trial record that substantiated his legal claim; and (3) showed prejudice to his substantial rights under the standards in Rule 44.2 of the Texas Rules of Appellate Procedure." *Id.* at 909. Stated another way, "trial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and that the flaws adversely affected his substantial rights to a fair trial." *Id.*

In this case, Romero-Perez asserted in her second motion that she was entitled to a new trial because "the verdict was contrary to the law and evidence" and because "the trial court erred in overruling the defendant's motion for a directed verdict." These grounds challenge the legal sufficiency of the evidence supporting Romero-Perez's conviction and nothing more. *See Zalmon*, 400 S.W.3d at 594 (emphasizing that Court of Criminal Appeals has held repeatedly that "allegations that a verdict was against the law and the evidence raised a sufficiency challenge and *only* a sufficiency challenge" and "did not raise any other claim"); *Madden v. State*, 799 S.W.2d 683, 686 (Tex. Crim. App. 1990) ("A challenge to the trial judge's ruling on a motion for an instructed verdict is in actuality a challenge to the sufficiency of the evidence to support the conviction."). Courts must be mindful that "when a jury returns a guilty verdict and the trial court grants the defendant's motion for new trial based upon insufficiency of the evidence . . . double jeopardy prevents the trial court from entering any other judgment than an acquittal." *State v. Savage*, 933 S.W.2d 497, 499 (Tex. Crim. App. 1996); *see also Hudson v. Louisiana*, 450 U.S. 40, 43 (1981) ("[A] reversal 'due to a failure of proof at trial,' where the State received a 'fair opportunity to offer whatever proof it could assemble,' bars retrial on the same charge." (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)).

"[A] motion for new trial based on insufficiency of the evidence presents a legal rather than a factual question," and the trial court "must apply the same legal test" that appellate

courts use when reviewing sufficiency challenges on appeal. *State v. Daniels*, 761 S.W.2d 42, 45 (Tex. App.—Austin 1988, pet. ref'd). "Accordingly, when deciding whether to grant a new trial challenging the legal sufficiency of the evidence, the trial court views the evidence in the light most favorable to the verdict and determines whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt." *State v. Medina*, 536 S.W.3d 528, 532 (Tex. App.—San Antonio 2017, pet. ref'd); *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Braughton v. State*, 569 S.W.3d 592, 607–08 (Tex. Crim. App. 2018). "If any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt, then the trial court abused its discretion in granting the motion for new trial." *Medina*, 536 S.W.3d at 532; *see State v. Fuller*, 480 S.W.3d 812, 819-20 (Tex. App.—Texarkana 2015, pet. ref'd); *Kelley v. State*, 429 S.W.3d 865, 876 (Tex. App.—Houston [14th Dist.] 2014, pet. ref'd); *Daniels*, 761 S.W.2d at 45.

### Principles governing sufficiency review

"Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Burks*, 437 U.S. at 16). "On sufficiency review, a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a 'meaningful opportunity to defend' against the charge against him and a jury finding of guilt 'beyond a reasonable doubt.'" *Id*. (quoting *Jackson*, 443 U.S. at 314–15).

"That limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id*. (quoting *Jackson*, 443 U.S. at 319). "The jury is the sole judge of credibility and

9

weight to be attached to the testimony of witnesses." *Merritt v. State*, 368 S.W.3d 516, 526 (Tex. Crim. App. 2012) (citing *Jackson*, 443 U.S. at 319). "We permit juries to draw multiple reasonable inferences from facts as long as each is supported by the evidence presented at trial." *Id*. A reviewing court is not permitted to "reevaluate the weight and credibility of the evidence in the record and thereby substitute [its] own judgment for that of the factfinder." *Braughton*, 569 S.W.3d at 608. Instead, a reviewing court is to "adhere to the *Jackson* standard and determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the verdict." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007). "When the record supports conflicting inferences, we presume that the jury resolved the conflicts in favor of the verdict and defer to that determination." *Merritt*, 368 S.W.3d at 525–26 (citing *Jackson*, 443 U.S. at 326).

When reviewing the sufficiency of the evidence to support a conviction, courts are to "measure the evidence by the elements of the offense as defined by the hypothetically correct jury charge." *Braughton*, 569 S.W.3d at 608 (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)). "This hypothetically correct jury charge accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Alfaro-Jimenez v. State*, 577 S.W.3d 240, 244 (Tex. Crim. App. 2019) (citing *Ramjattansingh v. State*, 548 S.W.3d 540, 546 (Tex. Crim. App. 2018)). "'As authorized by the indictment' means the statutory elements of the offense as modified by the charging instrument." *Id*. This standard applies "regardless of the specific wording of the jury charge actually given" and "ensures that a judgment of acquittal is reserved

10

for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted." *Malik*, 953 S.W.2d at 240.

### The charged offense

The State charged Romero-Perez with the offense of continuous trafficking of persons, committed on or about October 29, 2015, through on or about April 1, 2016. A person commits that offense "if, during a period that is 30 or more days in duration, the person engages two or more times in conduct that constitutes an offense under Section 20A.02 [trafficking of persons] against one or more victims." Tex. Penal Code § 20A.03(a). As charged in the indictment, a person commits a trafficking offense under Section 20A.02 "if the person knowingly traffics a child and by any means causes the trafficked child to engage in, or become the victim of" the offenses of indecency with a child, sexual assault, or sexual performance by a child, *id*. § 20A.02(a)(7)(B), (C), (I), or by "receiv[ing] a benefit from participating in a venture that involves" those offenses, *id*. § 20A.02(a)(8).[5] "Traffic," as defined in the Penal Code, means "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id*. § 20A.01(4). "Benefit," as defined in the Penal Code, means "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested." *Id*. § 1.07(a)(7).

---

[5] The indictment contained three paragraphs charging Romero-Perez with trafficking under subsection (7) and three paragraphs charging Romero-Perez with trafficking under subsection (8).

*Evidence presented at trial*

Romero-Perez was the aunt of the child, who was born in Honduras on September 8, 2000. When the child was thirteen years old, Romero-Perez arranged to smuggle the child and the child's grandmother into the United States. Romero-Perez told the child that she had paid approximately $6,000 for her passage. Multiple witnesses provided testimony tending to show that upon the child's arrival in Texas, Romero-Perez acted as the child's primary caretaker. The child lived with Romero-Perez and was required to follow her rules.

When the child first arrived in Texas, Romero-Perez enrolled her in school. However, by February 2015, Romero-Perez had withdrawn the child from school and made her work full time caring for Romero-Perez's children, cleaning Romero-Perez's house, and cleaning other houses and apartments in the area as part of Romero-Perez's home-cleaning business. The child was not paid for any of this work, and the child claimed that Romero-Perez had forced her to work "to pay back her aunt for the $6,000 it cost to have her brought into the country."

In April 2015, the child was sent to live temporarily with Romero-Perez's sister. While the child was living there, she met Julio Jimenez, a 33-year-old man, and they became friends. After spending approximately four weeks with Romero-Perez's sister, the child returned home but remained in contact with Jimenez.

In September 2015, the child asked Romero-Perez for the money that the child believed she had earned from working for Romero-Perez. According to the child, Romero-Perez responded by slapping her, which prompted the child to run away from home on September 21, 2015. The child stayed with Jimenez for three days. After that, she went to her grandmother's house. The child's grandmother learned that the child had stayed with Jimenez, and she called

Romero-Perez to let her know that the child had been found. The child indicated that she wanted to stay with the grandmother, and the grandmother agreed that the child could live with her.

Jimenez testified that later that month, Romero-Perez called Jimenez and told him that she wanted to talk to him "about the situation that was happening with [the child]." Romero-Perez explained to Jimenez that she and the child were "having problems" and "could not live together" anymore but that Romero-Perez "had brought her to this country . . . from Honduras in order for [the child] to help her work." Romero-Perez also told Jimenez that she had paid $6,000 to "bring her here," and "if she's going to be with you, then you have to pay me that money that I paid to—to bring her over here."

On September 29, 2015, Jimenez met with Romero-Perez and the child at the home of the child's grandmother. Angel Cordero, the husband of the child's grandmother, also attended the meeting. Jimenez testified that at this meeting, Romero-Perez told him that the relationship that he had with the child was "a problem for [Jimenez] and for her" because the child was a minor. Romero-Perez explained that she "was not just going to spend money just for fun," and that Jimenez "had to pay her the money that she had spent to bring [the child] over here." Jimenez added, "I don't know what kind of problems that they were having, but she said take her because [the child and Romero-Perez] cannot live together." Romero-Perez also told Jimenez that if he did not pay her $6,000, "she was going to call the police and that [he] was going to be in jail." Jimenez testified that at the time of the meeting, he believed that Romero-Perez was attempting to sell the child to him. Initially, Jimenez refused to pay, but Romero-Perez insisted that he "had to pay . . . or [he] was going to suffer the consequences." Jimenez eventually agreed, and the two began negotiating the terms of payment. Romero-Perez told Jimenez that he needed to pay her $1,000 per month, but Jimenez responded that he could not

afford that amount. Romero-Perez and Jimenez agreed that Jimenez would pay her $700 per month, with the first payment due in twenty days.

The child provided similar testimony regarding the meeting. She testified that Romero-Perez told Jimenez that she wanted him to pay her $6,000 "to pay for the trip that she had spent on [her]." The State asked the child, "Did Gloria want Julio to take you?" The child answered, "Yes." The State also asked the child, "Do you know why Gloria wanted Julio to take you?" The child answered, "Because she felt that the first day that I left with Julio, we had had sex." The child testified that Jimenez refused to pay Romero-Perez until she threatened to call the police and immigration. After Romero-Perez threatened him, Jimenez agreed to pay Romero-Perez $700 on the 29th of each month, on the condition that she provide him with written receipts. The child also testified that Romero-Perez gave Jimenez some condoms.

The other person who had attended the meeting, Angel Cordero, the grandmother's husband, provided conflicting accounts of what had occurred. At trial, Cordero testified that Romero-Perez had not "demanded" money from Jimenez. Instead, Cordero claimed that Jimenez and the child had agreed to pay Romero-Perez voluntarily because the child "was tired of [Romero-Perez] asking for the money." Cordero denied that Romero-Perez had threatened to report Jimenez to the police, that she had negotiated payment with Jimenez, and that she had told Jimenez to "take" the child from her.

However, during an interview with police officers, a video recording of which was admitted into evidence, Cordero told the officers that prior to the meeting, Romero-Perez had told Cordero and the grandmother to call Jimenez and tell him that if he did not "come and pick up [the child], she was going to call the cops on him." Cordero also informed the officers that at the meeting, Romero-Perez told Jimenez that he was "going to have to take [the child]

14

because I don't want her anymore," that Jimenez was "going to have to pay me for what I wasted for bringing her here," that the amount of the payment would be $700 or $800 per month, and that if Jimenez did not pay her, she would "call the cops on him." When confronted with the recording of his statements to the officers, Cordero claimed that what he had told the officers "wasn't really true because at that moment [he] was upset or angry" and that "those are things that [he] really [doesn't] even remember."

The grandmother, during her testimony, denied that the meeting had occurred. However, the grandmother was also interviewed by the police at the same time as her husband, and during that interview, she indicated that she had knowledge of the meeting. Additionally, the child testified that the grandmother had called Jimenez prior to the meeting and told him that Romero-Perez "wanted to see him." Moreover, a transcript of a voicemail recording from the grandmother to Romero-Perez was admitted into evidence, and it included the following:

> Look Gloria, I know that you have a point in everything, but I don't have anything to do with the mess [the child] did; do you understand? I want to be in peace. They said you made a deal with that guy, but I don't know what kind of a deal it is. I sent him a message just like you told me to but I don't want to [be] involved in this anymore. You and that guy made a deal. I don't know what deal, right, but you all do. . . .

After the meeting, the child went to live with Jimenez, and they had sexual intercourse at Jimenez's residence on multiple occasions. The child estimated that they had sex approximately ten times, while Jimenez provided conflicting estimates ranging from three to fifteen times. There was also conflicting evidence as to when the child and Jimenez began having sex. They both testified they did not have sex during the three days that the child had run away from home. However, Jimenez testified that they had sex shortly thereafter, while the child

15

testified that they waited two weeks after they began living together. Eventually, the child became pregnant with Jimenez's baby.[6] Romero-Perez learned of the pregnancy in January 2016. According to the child, when Romero-Perez learned of the pregnancy, she threatened to deport the child and warned her "that the State would keep [the baby]."

Jimenez testified that during the time that the child was living with him, he made at least three payments to Romero-Perez, who gave him handwritten receipts for two of the payments in accordance with their agreement. The receipts, which were admitted into evidence, were dated October 29, 2015, and November 29, 2015, signed by Romero-Perez, and stated that payment had been "received from" Jimenez. The first receipt stated that the "amt of account" was $6,000.00, the "amt paid" was $900.00,[7] and the "balance due" was $5,100.00. The second receipt stated that the "amt of account" was $5,100.00, the "amt paid" was $700.00, and the "balance due" was $4,400.00. The child also documented some of the payments in a personal notebook that she kept. Copies of three of the child's entries in the notebook were admitted into evidence, documenting partial payments that were made on October 2, 2015, October 25, 2015, and January 15, 2016. Additionally, Jimenez testified that Romero-Perez prepared a handwritten document at Jimenez's request memorializing their agreement after Romero-Perez had made the first payment. The document, a copy of which was admitted into evidence, provided the following:

---

[6] There is conflicting evidence in the record as to when the child became pregnant, but it appears to have been sometime between October and December 2015. DNA testing confirmed Jimenez's paternity of the baby.

[7] The child testified that the first payment included an additional $200 that Romero-Perez had demanded "to cancel [the child's] case with the immigration attorney."

16

Nov. 1, 2015

Mr. Julio Gimenez [sic] and [the child] owe me the amount of $6,000 and we agreed that they would give me payments of $700 each month on the 29th day of each month. I have received the first payment of $700 on the 31st day of October 2015.

They cannot fall behind on payment.

$6,000 – Principal
$ 700  Credit
$5,300 Pending


At some point in January 2016, Jimenez refused to make any more payments. This upset Romero-Perez, who began visiting Jimenez at his residence. Jimenez worked at a ranch in Fischer, Texas, and he lived in a trailer on the ranch. Jimenez testified that Romero-Perez came to the ranch on multiple occasions, first demanding payment and later demanding the return of the child. One of Jimenez's co-workers at the ranch, Yemie Chacaj, testified that he saw Romero-Perez at the ranch on three occasions. Romero-Perez also began sending threatening text messages to Jimenez, including the following:

Julio, since you're at the restaurant, I need for you to retrieve my money. We all have problems. It's been more than a month since you've given me money, and the truth is, if you don't pay me anything today then on the 29th I don't want excuses.

You're not going to answer? Well, then I'll see you at the ranch.

Hello, Julio. Get [the child] to show you the messages that I sent to you, please. Because that way you know what is going on.

I am not going to call you all anymore. I tried and with you all, nothing can be done. I was in agreement with [the child's] situation but I am going to take precautions. I am not going to say anything more.

17

I'm going to request that they go find her, Julio. [The child] is a minor and I have custody and that's why I'm going to take action.

I figured out what you all did. So then I'm going to make you and everyone understand that I am not y'all's toy. The lady, Victoria, should not have gotten involved knowing where she stands with immigration.

You should understand that she is a minor and I feel sorry for you, I have the custody, and if I feel like it, I will go get you wherever you are.

Now is when you will get to know me, Julio.

On April 1, 2016, after Romero-Perez had obtained legal custody of the child,[8] Romero-Perez went to the Kyle Police Department and reported the child as a runaway. According to Officer Juan Bazaldua, who spoke with Romero-Perez at the station, "She told me [the child] was six months pregnant and was living with Julio Jimenez, who was the father of the unborn child, and that . . . [the child] was currently at Julio's house, which was in Fischer, Texas." Romero-Perez also told Bazaldua that the child was fifteen years old and that Jimenez was in his thirties, and she provided Bazaldua with Jimenez's address.

Deputy Daniel Luna of the Comal County Sheriff's Office was dispatched to Jimenez's residence. Upon arrival, Deputy Luna found the child but was unable to communicate with her because the child spoke only Spanish. After finding a worker at the ranch who could translate for him, Luna asked the child to provide identifying information. In response, the child "presented what appeared to look like two handwritten receipts" for payment. According to Luna, the child told a Spanish-speaking deputy that she had been "sold" to Jimenez by her aunt. Jimenez was arrested at the ranch, and the police began investigating him and Romero-Perez.

---

[8] On March 25, 2016, Romero-Perez was appointed the sole managing conservator of the child.

Following the police investigation, the State charged both Jimenez and Romero-Perez with trafficking offenses. Jimenez pleaded guilty to the offenses of continuous trafficking of persons, sale or purchase of a child, sexual assault of a child, and indecency with a child by contact. He was sentenced to 30 years' imprisonment for trafficking, 10 years' imprisonment for sale or purchase of a child, and 20 years' imprisonment for sexual assault and indecency, with the sentences to run concurrently. Copies of Jimenez's judgments of conviction were admitted into evidence.

*Analysis*

Romero-Perez asserts that the evidence is insufficient to prove that Romero-Perez: (1) "caused" the child to engage in or become the victim of prohibited sexual conduct; (2) received a "benefit" from participating in a venture that involved a trafficking offense; and (3) engaged in "trafficking" as that term is defined in the Penal Code. In this case and on this record, we disagree with these assertions.

We first address causation. "A person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Penal Code § 6.04(a). Romero-Perez asserts that "there is no evidence that [she] caused [the child] to engage in sexual contact" with Jimenez. According to Romero-Perez, because the child met Jimenez, ran away from home to be with him, and stayed with Jimenez for three days "without [Romero-Perez's] knowledge or intervention," Romero-Perez was not responsible for the child engaging in prohibited sexual conduct with Jimenez.

19

However, on this record, the jury could have reasonably inferred otherwise. Although the child's relationship with Jimenez began before Romero-Perez became aware of it, there was conflicting evidence on when the relationship became sexual. The child testified that she did not have sex with Jimenez until two weeks after she had moved in with him. This was after the meeting at which Romero-Perez made an agreement with Jimenez to receive payment in exchange for him "taking" the child to live with him. According to the child, Romero-Perez also provided Jimenez with condoms. At the time of the meeting, both Jimenez and the child believed that Romero-Perez was "selling" the child to Jimenez. The jury could have reasonably inferred that Romero-Perez's actions in arranging the meeting, negotiating the agreement, and providing condoms to Jimenez encouraged Jimenez either to initiate sexual conduct with the child or, if he had already done so, to continue engaging in sexual conduct with the child. Moreover, although the child had spent three days with Jimenez prior to the meeting, she had left Jimenez's residence after those three days and was staying with her grandmother when the meeting took place. The child testified that she wanted to live with the grandmother, and the grandmother had agreed that the child could live with her. Thus, the jury could have reasonably inferred that but for Romero-Perez's agreement with Jimenez for him to "take" the child in exchange for payment, the child would not have moved in with Jimenez.

We next address whether Romero-Perez received a "benefit." The evidence summarized above shows that Jimenez made multiple cash payments to Romero-Perez, including $900.00 in October 2015 and $700.00 in November 2015. Receipts documenting these payments were admitted into evidence, and the child and Jimenez both testified that the payments were made. They also testified that they made a third payment to Romero-Perez in January 2016 but did not receive a receipt for this payment.

20

Romero-Perez does not deny that she received these payments but contends that they were not for allowing Jimenez to have sex with the child. Instead, the payments were to "reimburse" her for the money that she had spent to bring the child into the country. However, "benefit" is defined broadly in the Penal Code to mean "anything reasonably regarded as economic gain or advantage, including benefit to any other person in whose welfare the beneficiary is interested." Tex. Penal Code § 1.07(a)(7). The jury could have reasonably inferred that receiving reimbursement for money that Romero-Perez had spent to obtain the child constituted an "economic gain or advantage." Moreover, because Romero-Perez received those payments from Jimenez when the child was living and having sex with Jimenez, the jury could have reasonably inferred that Romero-Perez had received those benefits from providing the child to Jimenez so that he could have sex with her.

Finally, we address whether Romero-Perez engaged in "trafficking" as that term is defined in the Penal Code. Traffic means "to transport, entice, recruit, harbor, provide, or otherwise obtain another person by any means." *Id*. § 20A.01(4). In this case, the relevant term is "provide," which is not defined in the Penal Code but has a common and ordinary meaning of "to supply or make available." Webster's Ninth New Collegiate Dictionary 948 (1990); *see* New Oxford American Dictionary 1406 (3rd ed. 2010); Webster's New Universal Unabridged Dictionary 1556 (1996).

Romero-Perez asserts that because she did not gain "legal custody" of the child until March 2016, she "had no control" over the child and no "legal authority" to allow the child to stay in anyone's home or to direct or allow anyone to take possession of the child. However, an individual does not need legal custody of a person to make that person available to others. By all accounts, Romero-Perez was the primary caretaker of the child upon the child's arrival in

21

Texas. The evidence in the record shows that Romero-Perez had access to the child, fed and clothed the child, exercised authority over the child, made rules for the child and enforced those rules, enrolled and later withdrew the child from school, and compelled the child to work when the child was no longer attending school. The jury could have reasonably inferred from this evidence that Romero-Perez had control of the child and, in exercising that control, made the child available to Jimenez by having the grandmother instruct Jimenez to come to the September 29 meeting at which the child was present, by directing or allowing Jimenez to "take" the child with him, by demanding payment from Jimenez in exchange for Romero-Perez allowing the child to live with him and not reporting Jimenez to authorities, and by negotiating the terms of payment that Jimenez would be able to afford. The jury could have further inferred that Romero-Perez continued to make the child available to Jimenez by failing to report him to authorities until April 1, 2016, several months after she had directed or allowed the child to live with Jimenez and after she had accepted multiple payments from Jimenez.

Viewing the above evidence in the light most favorable to the verdict, we conclude the evidence is legally sufficient to support Romero-Perez's conviction. Because this was the only ground alleged in Romero-Perez's second motion for new trial, the district court abused its discretion in granting her a new trial.[9]

We sustain the State's second point of error.

---

[9] In her brief, Romero-Perez also asserts that the district court could have granted a new trial in the "interest of justice." However, this ground was not alleged in Romero-Perez's second motion for new trial and is not a permissible ground on which the district court's order could be based. *See supra* n.4.

**CONCLUSION**

We reverse the order of the district court granting Romero-Perez a new trial, and we remand this cause to the district court with instructions to reinstate the judgment of conviction and the sentence in accordance with the jury's verdict. *See State v. Arizmendi*, 519 S.W.3d 143, 151 (Tex. Crim. App. 2017).

_____

Gisela D. Triana, Justice

Before Chief Justice Rose, Justices Baker and Triana

Reversed and Remanded

Filed:   March 26, 2020

Do Not Publish